

1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    DARYL LYONS,                          No. CIV S-02-1355-LKK-CMK-P

12                    Plaintiff,

13          vs.                             <u>FINDINGS AND RECOMMENDATIONS</u>

14    BUSI, et al.,

15                    Defendants.

16    _____/

17              Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18    to 42 U.S.C. § 1983.   Pending before the court is defendants' motion for summary judgment

19    (Doc. 119).

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

# I. BACKGROUND

This case proceeds on plaintiff's second amended complaint (Doc. 21), filed on April 16, 2004, as against the following defendants:  Moss, Frates, Dragash, Busi,[1] Haynes, and Wauwsrovksy.[2]  This action concerns events which occurred on April 7, 2001, while plaintiff was a prisoner at Mule Creek State Prison.  Specifically, plaintiff asserts Eighth Amendment claims based on excessive force and failure to provide medical treatment.

Defendants' Summary of Facts

According to defendants, plaintiff was experiencing mental problems and hallucinations on the date of the incident.  Defendants state that, prior to the incident, plaintiff had a history of refusing to take his psychiatric medications and that, on April 6, 2001, he told mental health staff that he believed correctional officers were attempting to poison him with medications.  He also told mental health staff that he was seeing "small, brown, devil-like creatures running around his cell."

Defendants state that, on April 7, 2001, defendant Dragash was directed to remove plaintiff from his cell and transfer him to a "holding cage" where escort officers would then take him to the infirmary to see the psychiatrist.  When defendant Dragash approached plaintiff's cell, plaintiff told him that voices said defendant Dragash was a demon.  Therefore, in order to avoid agitating plaintiff, defendant Dragash requested that defendant Haynes remove plaintiff from his cell.  Defendant Haynes approached plaintiff's cell and directed plaintiff to place his hands through the food port "so that Plaintiff could be handcuffed behind his back before the cell door was opened."  According to defendants, this was accomplished:  "[Defendant] Haynes placed

---

[1]        Incorrectly named as "Bussi."

[2]        Defendants Haynes and Wauwsrovsky remained unserved.  On March 26, 2008, the court directed plaintiff to show cause why these individuals should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for failure to effect timely service of process.  Plaintiff did not file any response to the order to show cause.  The court will now recommend dismissal of Haynes and Wauwsrovsky.

1    handcuffs on Plaintiff."  Defendant Moss then unlocked the cell door.

2              Defendants state that, as defendant Haynes was removing plaintiff from his cell,

3    but before "Haynes could take control of Plaintiff . . .," plaintiff took the side-handled baton from

4    defendant Haynes' duty belt and "held the baton in front of him at chest level, swung it back and

5    forth and stated, 'come and get it.'"  Defendant Haynes then sprayed pepper spray in plaintiff's

6    face and thereafter defendant Moss closed the cell door with plaintiff still inside.  Plaintiff then

7    returned the baton through the food port.  Defendants state:  "Defendant Dragash directed

8    Plaintiff to place his hand through the food port, he removed the handcuffs, and re-handcuffed

9    Plaintiff behind his back."  Plaintiff was then taken to the shower and decontaminated with cool

10   running water.

11             According to defendants, plaintiff was examined by a nurse who found no visible

12   injuries other than irritation to plaintiff's eyes caused by the pepper spray.  Plaintiff was also seen

13   by the prison staff psychiatrist.  He told the psychiatrist that demons had attacked him.  After

14   plaintiff became abusive, the psychiatrist recommended that plaintiff be admitted to a mental

15   health care crisis bed, but plaintiff refused.  Two days later, plaintiff was seen by defendant Busi,

16   a medical doctor.  Defendant Busi also did not observe any injuries.  Defendant Busi treated

17   plaintiff for hepatitis C, referred him to a podiatrist, and prescribed aspirin for plaintiff's

18   complaints of pain.

19                            Plaintiff's Deposition Testimony

20             At his deposition, which was taken on April 13, 2007, plaintiff stated that he

21   understood that this case was limited to his Eighth Amendment excessive force and medical

22   treatment claims arising from the events of April 7, 2001.  Plaintiff testified that, at the time of

23   the incident, he was receiving mental health treatment and was taking Zoloft, Risperdal, Zyprexa,

24   and other psychiatric medications.

25   / / /

26   / / /

3

Plaintiff testified that, at about 7:30 a.m. on April 7, 2001, he received his breakfast tray from defendant Haynes.  As to his breakfast tray, plaintiff stated:

> I could see that it had dust, dust in it and saliva.  And when I looked up under the bread, there was a rat in the – up under my bread.

Plaintiff admitted that he was having visual hallucinations on April 7, 2001, as well as the preceding days.  Specifically, he recalled that he was seeing "devils, little brown devils." Plaintiff, however, denied that he was hallucinating when he saw a rat on his breakfast tray. Plaintiff testified that defendants Haynes and Dragash confirmed that they saw a rat on his tray, but denied putting it there.  Plaintiff testified:

> Q:      . . . Now, you also indicated that Officers Haynes and Dragash came back to get your – your tray and you refused to give it to them and they began making comments in front of you about your being crazy?
>
> A:      Yeah.
>
> Q:      What happened after that?
>
> A:      They eventually said, "You're gonna give up that tray or we're gonna beat your ass.  We gonna beat your mother fucking ass this time."  So what I did was – oh, they could take – they knew something was going on at that point and saw me turning around in the cell, and then I said – I said, "What's that?"  They said, "What's what?"  I said, "What's that right there?"  They said, "What's what?"  I said – I said – "Mans, that's a little devil right there."
>
> Q:      And were you actually seeing a little devil at the time you said that to them?
>
> A:      Yeah.
>
> Q:      Okay, and what was their response when you pointed it out?
>
> A:      They said, "Oh, shit," and started laughing.  They said, "You really are crazy."

After this, defendant Haynes and Dragash began taunting plaintiff by saying:  "Right behind you, right there, there's a little devil right there."  Plaintiff testified that, after this, he put a paper over the window to his cell "so they couldn't look in the cell."  Plaintiff stated that he knew it was

against prison rules to cover the window and that he had received rules violation reports for

doing this on previous occasions.

Plaintiff testified that, after this, defendant Frates came to his cell and asked

plaintiff to remove the paper covering from the window, but that he refused.  He also testified as

follows:

> Q:     And how was it that you eventually ended this conflict that you were having with the officers?
>
> A:     I'm not sure if I understand the question.
>
> Q:     Well, the officers wanted your tray, they wanted you to remove the cell papering, you were refusing to do that?
>
> A:     Right, to give them the tray or take the paper down.
>
> Q:     Exactly.
>
> A:     Uh-huh.
>
> Q:     How did this conflict between you and the officers end?
>
> A:     Oh, they came in my cell.
>
> Q:     Who did?
>
> A:     Officers Dragash and Haynes.

Plaintiff stated that defendant Frates was not present when defendants Dragash and Haynes

entered his cell.  He also testified that the cell door was opened by defendant Moss from the

control booth after defendants Dragash and Haynes said:  "Pop cell 101."

Next, the following exchange took place at plaintiff's deposition:

> Q:     And when your cell door opened, do you recall attempting to take something from one of the officers?
>
> A:     Eventually.
>
> Q:     What did you try and take?
>
> A:     I didn't try, I did.
>
> Q:     What did you take?

1       A:      I took a side handled baton from them.

2       Q:      From whom?

3       A:      Officer Dragash.

4       Q:      Why did you do that?

5       A:      Because he hit me with it.

6       Q:      Where did he hit you with it?

7       A:      In the head, in the back of the head and neck area.

8       Q:      How many times did he hit you with it?

9       A:      Well, he hit me once initially, which it dropped me, and then they both began to hit me.  And it wasn't so much swinging as they were taking two hands like this and kind of like stabbing me with it.

10

11      Q:      Stabbing you with the baton?

12      A:      Yeah, and then there was hitting me like in my joints.

13      Q:      In your neck?

14      A:      In my neck, arms, back.

15      Q:      In your arms and in your back?

16      A:      Yeah, they was hitting me everywhere.

17      Q:       And by they, you mean Officer Dragash?

18      A:      And Haynes.

19              * * *

20      A:      Do you recall making any motions before they started doing this or did they just do this out of the blue?

21

22      A:      They just – I was laying there and they just said, "Pop the door."  I heard them say, "Pop the door," and the door just opened and they came in.

23

24      Q:      Did they make any statements when they came into your cell, or did they just begin stabbing you with their batons?

25      A:      Oh, they said something.

26      Q:      What did they say?

1  A:      "Open the door."  And I was laying there and they said – I
jumped up out of the bed.  I said, "What do you guys want?"  And Haynes
2  was like personally in the cell already, and he said, "There's a demon,
there's a devil right under your bed."  And I turned, and when I turned, he
3  stepped in me and hit me in the back of the head and neck area.

4  * * *

5  Q:      Okay.  Did Dragash say anything?

6  A:      Yeah.

7  Q:      What did he say?

8  A:      I heard him say, "Hit him, hit him in his joints, don't hit
him where – where he'll bruise."

9

10  Plaintiff testified that he took the baton and held it in front of his chest and used it to push one of

11  the defendants out of the cell.  He stated that both defendants Dragash and Haynes sprayed him

12  with pepper spray.  After both defendants were out of the cell, the cell door was closed.

13  According to plaintiff, after the door was shut defendant Frates said "You better

14  get that billy club, get that baton back before the lieutenant gets here" whereupon plaintiff

15  returned the baton and was handcuffed with his hands in back.  Plaintiff denies ever being

16  handcuffed with his hands in front.  Plaintiff testified that he gave the baton back because it was

17  the only way the officers would agree to take him to the shower to wash off the pepper spray.

18  After plaintiff returned the baton, he was taken to the shower and decontaminated with cold

19  water.

20  Regarding his medical treatment after the cell removal incident, plaintiff testified

21  as follows:

22  Q:      So after you were in the shower you were returned to your
cell door?
23
24  A:      No, from the shower I went over to the infirmary.

* * *
25
26  A:      That's when I saw Dr. Wauwsrovsky.  They didn't let me
see a medical doctor, but I saw Dr. Wauwsrovsky, the psychiatrist.

Q:   I see, and did you make any requests to anyone to see a medical doctor?

A:   Yeah.

Q:   And who did you make the request to?

A:   To the nurse, to Dr. Wauwsrovsky, to everybody present.

Q:   So you did see a nurse?

A:   No, there was a nurse present, but she didn't see me.

* * *

Q:   Did you make a statement to that nurse?

A:   I told the nurse that I was having problems, that I was beat up.

Q:   Okay.

A:   That I had – I was hurting.

Q:   Do you remember the nurse looking at you and your body?

A:   No.

Q:   Do you remember telling the nurse that you had suffered any injury?

A:   Yeah.

* * *

A:   I told her that my head was hurting, my back was hurting.

Q:   Now, to your knowledge –

A:   And that my eyes was hurting from the spray.  And that my throat, I could hardly talk.

Q:   Now –

A:   And eventually I had to have surgery on my throat.

Q:   To your knowledge did you have any visible injuries at that time, like any bruises, cuts?

A:   Yeah.

1                                    * * *

2                      Q:      All right, did you have any other injuries other than on your
   elbow and maybe on your back?

3

4                      A:      Well, no, I can't think of anything.

5      As to defendant Wauwsrovsky, plaintiff testified that he was provided with the option of being

6      admitted to the crisis unit for psychiatric observation, treatment, and suicide watch, but that

7      plaintiff declined because he was not suicidal.

8                      According to plaintiff, he saw defendant Busi two days later on April 9, 2001.

9      Plaintiff stated at his deposition that he was not satisfied with his medical treatment:

10                     Q:      And were you dissatisfied with the medical care he
   provided on that day:

11

12                     A:      Yeah, I was.

13                     Q:      Why?

14                     A:      Because the officer was right there inside the clinic telling
   Dr. Bussi that nothing happened to me on that day.  He was pretty much
   telling Dr. Bussi that I was lying and Dr. Bussi would not take my

15     complaint seriously.

16                     Q:      Did you overhear that conversation –

17                     A:      He said it right in front of me.

18                     Q:      Okay, and did you make any statements to Dr. Bussi telling
   him that you disagreed with the officer's interpretation?

19

20 .                   A:      No, I didn't tell him that.

                       Q:      Did you tell Dr. Bussi what kind of medical complaints you
21     had?

22                     A:      Yeah.

23                     Q:      And how did he respond?

24                     A:      Well, he responded by telling me that he was going to do a
   liver panel and he was going to look for all this other – do all this other

25     stuff that had nothing to do with – with my complaints.

26                                   * * *

                                          9

1           Q:     Did you have any other medical complaints other than
Hepatitis?

2

3           A:     Yeah, well, no.  Other than the fact that I was in pain.

          Q:     Did he provide you with any other medical treatment other

4 than the panel of liver samples?

5           A:     I think he did do some x-rays.  I did ask for some x-rays to
be done.

6

7           Q:     And he ordered the x-rays, Dr. Bussi?

          A:     I believe he did order the x-rays, that was on – let me see.  I

8 had the x-rays on April – April – that was on the 20th I had done of my
cervical spine, and on May the twenty – well, that was on my hips, I was

9 having problems with my hips also, and I believe that were a direct result
of the injuries I received that day. . . .

10

11 Plaintiff testified that the x-rays revealed that "something was wrong with my neck and my back"

12 but that medical staff "didn't do anything."  He stated that he was not given any medication for

13 pain.

14           Plaintiff also testified concerning the alleged basis of liability of defendant Moss:

15           Q:     Is . . . the sole basis of your claim against Officer Moss, that
she opened your cell door?

16

17           A:     Well, not exactly.  Well, yeah, because I'm saying that
Officer Moss opened my cell door with the knowing knowledge that I was
not handcuffed.

18

19           Q:     Okay.

          A:     And that it was not within the protocol and procedures for a

20 cell extraction.

21           Q:     Okay.

22           A:     That's what I'm pretty much saying.  And I'm saying that
it's my belief that she had some prior knowledge that this was going to

23 happen.

24           Q:     That –

25           A:     I was going to get attacked.

26           Q:     By Officer Haynes and Dragash.  Now, how did she have

1    that knowledge, how did you know she knew that?

2          A:    I don't, other than the fact that she opened that door.

3          * * *

4          Q:    Okay.  So it the basis of your claim against her then that she should have been more careful?

5

6          A:    Right.  She –

7          Q:    Not that she intentionally wanted you to get hurt, but just that she should have been more careful?

8          A:    Well, I mean initially when I did the complaint, I felt that she had a knowing knowledge that they came to do harm, and that's what I thought and believed at that time.

9

10         Q:    Do you still believe that?

11         A:    I don't know.  I haven't really looked at it, really rehashed it all in my head just yet.  I'm just – I don't know, because she's saying – she's saying she saw them talking to me through the tray slot and she's the only one that says that they were talking to me through the tray slot.

12

13

14         Q:    Well, now, aside from the fact that you – she saw the officers talking to you through the tray slot, do you have any other reason to believe that she intentionally wanted you to get hurt?

15

16         A:    Yeah.

17         Q:    What?

18         A:    By the fact she wasn't paying attention.

19         Q:    Okay, but now we talked about how that's just like a negligent thing.

20         A:    Right.

21         Q:    Like you should have done something differently –

22         A:    Yeah.

23         Q:    – as opposed to actually intending to hurt you.

24         A:    Right, right.  Exactly.  We're no talking about intentional negligence, we're talking about – well, I mean, because she wasn't paying attention, I mean – it's not so much intentional negligence as it is indirect negligence.

25

26

1                Q:     Meaning she should have been more careful?

2                A:     Right.

3          Regarding his specific claims against defendants Haynes and Dragash, plaintiff

4  testified as follows:

5                Q:     And then Officers Haynes and Dragash, your complaints against them are that they used excessive force against you when they
6  came into your cell by poking and stabbing you with the baton and pepper spraying you?

7

8                A:     Right.

                  Q:     Anything else against those two officers?

9

10              A:     Yeah, and the fact that they subjected me to mental anguish, along with the physical discomforts of being assaulted.

11       With respect to physical injuries, plaintiff testified:

12              Q:     All right.  Do you have any continuing injuries as a result of what happened in 2001?

13

14              A:     Yes, I believe so.

15              Q:     What are they?

16              A:     My neck, back.

17              Q:     What's wrong with your neck and back?

18              A:     Well, I'm still having problems with it.  There's some kind of – there's bones spurring in my neck and back, and my – my elbows were fractured.

19

20              Q:     How do you know that?

21              A:     Because I've already had the x-rays done.

22              Q:     When did you have those x-rays that showed that your elbows were fractured?

23              A:     I don't remember the exact date, but I had them done.  And that my rotary cuffs were torn in both my shoulders.

24

25              Q:     Your rotary cuffs you said?

26  ///

1    A;    Yeah, the ligaments in the shoulders.  They just did surgery
on this one, and the surgery was so bad just recovering off of it that I
2    decided I don't think I'm going to have surgery done in the left one.  And
then they wanted to do surgery on my back and neck, but I'm not going to
3    let them do no surgery in here.

4    Q:    What leads you to believe that the problems you've had
with your elbows and rotary cuff and your neck is a result of what
5    happened on April 7, 2001?

6    A:    Because I, you know I've experiences pain from those
injuries that I've never really felt before, and they haven't went away to
7    this day.

8    <u>Defendants' Declarations</u>

9    In support of their motion for summary judgment, defendants offer their

10   declarations as well as the declarations of T. Sandborn, John Ticer, and E.H. Messick.[3]  In his

11   declaration, defendant Dragash states:

12   1.    He and defendant Haynes were working as floor officers on April 7, 2001,
passing out breakfast trays to inmates:
13
14   2.    Plaintiff refused to return his breakfast tray until he was provided a lunch
sack;

15   3.    When the lunches arrived at the unit building, defendant Dragash returned
to plaintiff's cell;
16
17   4.    At this time, he saw that plaintiff had covered the window to his cell and
still refused to return his lunch tray;

18   5.    Plaintiff refused Dragash's order to remove the paper covering the
window;
19
20   6.    Upon instruction from defendant Frates, defendant Dragash returned to
plaintiff's cell with his sack lunch, but plaintiff still refused to remove the
paper and said that he thought defendant Dragash was a demon;
21
22   7.    Defendant Frates then instructed defendant Dragash to remove plaintiff
from his cell and escort him to a holding cage awaiting transport to the
infirmary to see a staff psychologist;
23

24   [3]    The declaration of T. Sanborn is not particularly instructive given that he states:
"I do not recall inmate Lyons, or this incident."  John Ticer is the inmate health records
25   coordinator and authenticates two documents attached do his declaration, both of which are
largely illegible.  E.H. Messick is the litigation coordinator and authenticates documents dated
26   April 7, 2001, from plaintiff's central file attached to his declaration.

8.      Wanting to remain out of plaintiff's sight, defendant Dragash asked defendant Haynes to remove plaintiff from his cell;

9.      Defendant Haynes "directed Lyons to place his hand through the food port of the cell so that he could be handcuffed behind his back before the cell door was opened";

10.     "Lyons placed his hands through the port, and Haynes placed handcuffs on him";

11.     Defendant Haynes then motioned for defendant Moss, the control booth officer, to open the cell door;

12.     As defendant Haynes was escorting plaintiff out of the cell, "Haynes stopped the escort, and I saw Haynes's baton projecting out of Lyons' cell";

13.     Defendant Dragash heard Lyons say "Come and get it";

14.     Eventually, defendant Haynes regained control of the situation after spraying plaintiff with pepper spray;

15.     Defendant Moss then closed the cell door and plaintiff returned the baton through the food port; and

16.     Defendant Dragash re-cuffed plaintiff's hands behind his back and escorted him to the shower area for decontamination.

Defendant Dragash adds that he never hit plaintiff with the baton or attempted to injure him, and that he took each action in the belief that they were necessary and lawful in order to fulfill his duties as a correctional officer.

In her declaration, defendant Frates states:

1.      Based on reports from plaintiff that plaintiff was seeing demons, defendant Frates instructed defendants Haynes and Dragash to arrange for plaintiff to see psychiatric staff for mental health treatment;

2.      Approximately one-half hour later, defendant Frates learned of a disturbance at cell 101; and

3.      When she arrived at the scene, defendants Haynes and Dragash were escorting plaintiff to the shower area.

Defendant Frates adds that she never instructed any officer to assault plaintiff.

///

14

In her declaration, defendant Moss states:

    1.    She was the control booth officer on April 7, 2001;

    2.    She opened plaintiff's cell door on instructions from defendants Haynes and Dragash;

    3.    When the cell door opened, defendant Moss "observed Officers Haynes and Dragash continue to speak with Lyons, however, Lyons was in his cell and I could not see him from my position";

    4.    Defendant Moss' attention was diverted briefly by a phone call and when she looked back towards plaintiff's cell she "observed Officer Haynes approximately two feet from the cell door with his pepper spray canister in his hand, and Officer Dragash was signaling for me to close the cell door"; and

    5.    Defendant Moss promptly closed the cell door.

Defendant Moss adds that she believed that defendants Haynes and Dragash directed her to open

plaintiff's cell door in order to carry out necessary custodial duties.

In his declaration, defendant Busi states:

    1.    During the spring of 2001, he and other physicians at Mule Creek State Prison were treating plaintiff for various medical conditions including back pain, digestive disorders, foot complaints, and hepatitis;

    2.    Defendant Busi treated plaintiff on April 9, 2001 regarding complaints of foot pain and complaints related to hepatitis;

    3.    Defendant Busi referred plaintiff to a podiatrist for his foot problems;

    4.    Defendant Busi ordered a blood draw to evaluate the condition of plaintiff's liver; and

    5.    On April 9, 2001, plaintiff did not have any visible injuries.

Defendant Busi adds that, in exercising his professional judgment, he treated plaintiff

appropriately and never refused to examine or treat him.  He states that he never intentionally or

knowingly caused plaintiff any pain, suffering, or injury.

/ / /

/ / /

/ / /

<u>Plaintiff's Exhibits</u>

Attached to plaintiff's opposition to defendants' motion for summary judgment is a radiology report dated April 20, 2001.  In this report, Dr. H. Walter Pepper set out his findings on examination of x-rays taken following an injury.  The date of the injury is not indicated.  Dr. Walter reports "[m]ild cervical spondylotic changes at C3, 4, 5, and 6, as evidence as disc space narrowing at 3-4 and small anterior osteophytic spurring at 3 through 6."  He did not observe any acute abnormalities.  Plaintiff also attaches other medical records, but these are from dates several years or more after April 2001 and, thus, do not appear to relate to the incident at issue in this case.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  <u>Id.</u>  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Id.</u> at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed

1   before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

2   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

3   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

4   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

5   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

6   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

7   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

8   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

9

10                              **III.  DISCUSSION**

11          Plaintiff asserts Eighth Amendment claims based on excessive force and failure to

12   provide medical treatment.  The treatment a prisoner receives in prison and the conditions under

13   which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which

14   prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993);

15   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and

16   idealistic concepts of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble,

17   429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See

18   Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide

19   prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint

20   v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth

21   Amendment only when two requirements are met: (1) objectively, the official's act or omission

22   must be so serious that it results in the denial of the minimal civilized measure of life's

23   necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly

24   for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth

25   Amendment, a prison official must have a "sufficiently culpable mind."  See id.

26   ///

A.   **Excessive Force**

When prison officials stand accused of using excessive force, the core judicial inquiry is ". . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  The "malicious and sadistic" standard, as opposed to the "deliberate indifference" standard applicable to most Eighth Amendment claims, is applied to excessive force claims because prison officials generally do not have time to reflect on their actions in the face of risk of injury to inmates or prison employees.  See Whitley, 475 U.S. at 320-21.  In determining whether force was excessive, the court considers the following factors: (1) the need for application of force; (2) the extent of injuries; (3) the relationship between the need for force and the amount of force used; (4) the nature of the threat reasonably perceived by prison officers; and (5) efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7.  The absence of an emergency situation is probative of whether force was applied maliciously or sadistically.  See Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc).  The lack of injuries is also probative.  See Hudson, 503 U.S. at 7-9.  Finally, because the use of force relates to the prison's legitimate penological interest in maintaining security and order, the court must be deferential to the conduct of prison officials.  See Whitley, 475 U.S. at 321-22.

1.   Defendants Frates and Moss

As to plaintiff's excessive force claim – which relates to his allegations against defendants Frates, Moss, and Dragash –  defendants Frates and Moss argue that they did not intend any injury to plaintiff.  Specifically, they assert:

> When Defendant Moss opened Plaintiff's cell door on April 7, 2001, she had no intent to harm him. On the morning of April 7, 2001, she was working in the control booth of the administrative segregation building.  Her duties included opening and closing the unit and cell doors to permit the floor staff to carry out their duties.  When Officers Haynes and Dragash motioned for her to open the door, she had no reason to suspect that these officers wanted her to open the door for any improper

19

purpose.  She opened Plaintiff's cell door with the reasonable belief that Officers Haynes and Dragash wanted the door open to carry out necessary custodial functions.   Although her attention was momentarily diverted to take down a telephone message, as soon as she saw Officer Haynes with his pepper spray canister out and Officers Haynes and Dragash motioning to close Plaintiff's cell door, she did so promptly.  At no time did she believe that Officers Haynes or Dragash had any intention to harm Plaintiff, and at no time did she intend to harm Plaintiff.  Therefore, she did not have the culpable state of mind necessary to support an Eighth Amendment violation.

Sergeant Frates likewise did not have any intention to harm Plaintiff. Although Plaintiff's complaint implies that Frates directed the officers to injure Plaintiff, in fact the opposite is true. When Dragash reported to Frates that Plaintiff was seeing "little brown devils" Sergeant Frates instructed Dragash to obtain mental health treatment for Plaintiff.  It was for this purpose, not to injure Plaintiff, that she instructed the officers to remove Plaintiff from his cell. Defendant Frates never instructed the officers to harm Plaintiff, and never misrepresented the events that occurred on April 7, 2001.  Plaintiff's allegations are without foundation, and Defendant Frates is entitled to summary judgment.

Insofar as Plaintiff has alleged that Defendants Frates and Moss violated Plaintiff's Eighth Amendment rights by enabling or facilitating Officers Haynes or Dragash, Plaintiff allegations are without foundation and are contradicted by the undisputed evidence. Therefore, the Court should enter summary judgment in their favor.

Turning to defendant Frates, there is no evidence that he was involved in the application of any force, let alone excessive force, against plaintiff.  According to plaintiff's deposition testimony and defendants' declarations, defendant Frates was a supervisory officer who instructed other defendants to remove plaintiff from his cell.  There is no evidence that defendant Frates instructed other defendants to harm plaintiff.  Similarly, defendant Moss' only involvement was as the officer in charge of opening the cell door and there is no evidence that she intended any harm to come to plaintiff.  Plaintiff admitted at his deposition that his claim against defendant Moss was based solely on the fact that she opened the cell door.

Defendants Frates and Moss are, therefore, entitled to summary judgment.

/ / /

/ / /

/ / /

/ / /

2.    <u>Defendant Dragash</u>

Defendant Dragash asserts:

The undisputed evidence shows that Dragash did not actually cause any injury to Plaintiff. For example, Plaintiff alleged he was struck with batons fifty times by Haynes and Dragash on April 7, 2001, yet the nurse who examined Plaintiff just minutes after this alleged attack did not observe any injuries on Plaintiff.   A psychiatrist who examined Plaintiff the day of the incident also failed to note any visible injuries, but advised Plaintiff to enter the mental health care delivery services system crisis bed to obtain psychiatric care.   Plaintiff refused this treatment, telling the psychiatrist to "go back to [his] backgammon game."   Dr. Busi, a medical doctor who treated Plaintiff two days later did not observe any injuries on Plaintiff either, but offered Plaintiff a five day course of Aspirin when Plaintiff complained of pain.   Dr. Busi proceeded to provide Plaintiff with normal treatment for his non- urgent, chronic health care conditions.

In addition, Plaintiff's allegation that Dragash struck and injured him are unreliable because Plaintiff admits he was having visual and verbal hallucinations on the day of the incident, including seeing "little brown devils" running around in his cell.   Plaintiff claimed that Defendant Dragash was a devil.   Plaintiff told a nurse that "demons" attacked him. Plaintiff has a documented history of believing that correctional and medical staff are attempting to kill him when the staff perform routine custodial functions.   Since the undisputed evidence shows that Plaintiff suffered no physical injuries on April 7, 2001, Plaintiff can not sustain an Eighth Amendment claim against Defendant Dragash. Therefore, the Court should enter summary judgment for Defendant Dragash.

Defendant Dragash also lacked the culpable state of mind necessary to support an Eighth Amendment claim. Defendant Dragash was attempting to remove Plaintiff from his cell so that Plaintiff could go see the psychiatrist, not to harm Plaintiff.   Dragash never struck Plaintiff and never intended to harm Plaintiff.   The undisputed evidence shows that Dragash did not even touch Plaintiff until after the situation was diffused and he placed handcuffs on Plaintiff. The only officer who used any force on Plaintiff was Officer Haynes, who sprayed Plaintiff with pepper spray after Plaintiff waived his baton at him.

Although Plaintiff alleged in his complaint that both Haynes and Dragash hit and struck him, Plaintiff has attached exhibits to his complaint where he claimed that only Officer Haynes struck him.   For example, Plaintiff attached an Inmate-Parolee Appeal Form 602, Log Number MCSP 01- 00930, dated April 8, 2001, in which he stated "C/O Haynes stepped in and hit me in the back of the neck with his stick.  I turned ant took it from him and pushed him out of the cell at which point he began to mace me."  Plaintiff also claimed it was only Haynes who used force against him in the Health Care Services Request Form, dated April 9, 2001, attached to the complaint. In this statement Plaintiff stated, "C/O Haynes hit me in the back of the neck with his billy club, that night I pass [sic] out and woke with vomit over me."

///

1

2

3

4

5

6

> In light of Plaintiff's contradictory allegations, and Dragash's testimony that he never hit or struck Plaintiff, the undisputed evidence shows that Dragash did not violate Plaintiff's Eighth Amendment rights. Plaintiff's allegation that Dragash struck him is not only contradicted by Dragash's declaration, and the medical evidence, but also by Plaintiff's own exhibits to the complaint. The totality of the evidence shows that Plaintiff's claim that Dragash beat him is the result of Plaintiff's documented, admitted mental illness. Therefore, the Court should grant summary judgment for Defendant Dragash on Plaintiff's Eighth Amendment claim.

7   By plaintiff's own admission (in his deposition testimony), plaintiff took

8   defendant Dragash's baton when he and officer Haynes entered plaintiff's cell at defendant

9   Frates' instruction.  Plaintiff claims that defendant Dragash then used excessive force in order to

10  restore security.  Specifically, plaintiff testified at his deposition that defendant Dragash and

11  officer Haynes hit him numerous times in the neck, back of the head, and joints.  Plaintiff

12  testified that he heard defendant Dragash suggest that they should hit plaintiff in locations where

13  bruises wouldn't be apparent.  In support of summary judgment defendant Dragash submits his

14  declaration stating that he never hit plaintiff with a baton or otherwise attempted to injure him.

15  The court does not agree with defendants that the "totality of the evidence shows

16  that Plaintiff's claim that Dragash beat him is the result of Plaintiff's documented, admitted

17  mental illness."  Rather, it appears that there is a factual dispute as to the material questions

18  whether Dragash used force against plaintiff and, if so, whether such use of force was excessive

19  under the circumstances.  On the one hand are defendant Dragash's declaration and documents

20  attached to the complaint suggesting that it was Haynes – not Dragash – who hit plaintiff with the

21  baton.  On the other hand is plaintiff's deposition testimony that Dragash _and_ Haynes hit him.

22  Defendant Dragash simply has not met his initial burden of demonstrating the absence of

23  disputed material facts.

24  ///

25  ///

26  ///

1    Having concluded that a triable issue of fact exists as to defendant Dragash's

2    conduct, the court next addresses his argument that he is entitled to qualified immunity.

3    Government officials enjoy qualified immunity from civil damages unless their conduct violates

4    "clearly established statutory or constitutional rights of which a reasonable person would have

5    known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general, qualified immunity

6    protects "all but the plainly incompetent or those who knowingly violate the law." Malley v.

7    Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified immunity, the initial

8    inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts

9    alleged show the defendant's conduct violated a constitutional right.  See Saucier v. Katz, 533

10   U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next step is to ask whether

11   the right was clearly established.  See id.  This inquiry "must be undertaken in light of the

12   specific context of the case, not as a broad general proposition . . . ." Id.  "[T]he right the

13   official is alleged to have violated must have been 'clearly established' in a more particularized,

14   and hence more relevant, sense:  The contours of the right must be sufficiently clear that a

15   reasonable official would understand that what he is doing violates that right." Id. at 202

16   (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable

17   officer in similar circumstances would have thought his conduct violated the alleged right.  See

18   id. at 205.

19        When identifying the right allegedly violated, the court must define the right more

20   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

21   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667

22   (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

23   sufficiently clear that a reasonable official would understand [that] what [the official] is doing

24   violates the right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the

25   court concludes that a right was clearly established, an officer is not entitled to qualified

26   immunity because a reasonably competent public official is charged with knowing the law

23

governing his conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff has alleged a violation of a clearly established right, the government official is entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also Saucier, 533 U.S. at 205.

The first two steps in the qualified immunity analysis involve purely legal questions.  See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal determination based on a prior factual finding as to the government official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

In this case, the court finds that the facts viewed in the light most favorable to plaintiff show that defendant Dragash violated plaintiff's clearly established Eighth Amendment right to be free from excessive force.  Specifically, assuming plaintiff's allegations are true, defendant Dragash used excessive force by hitting him repeatedly in the neck, back of the head, and joints during the course of the cell extraction.  As to the third step in the qualified immunity inquiry – whether defendant Dragash reasonably but mistakenly believed that his conduct did not constitute excessive force – the court finds that, as discussed above, a dispute of fact exists as to the exact scope of defendant Dragash's conduct.  Resolving this factual dispute in favor of plaintiff, the court concludes that any mistaken belief by defendant Dragash that his conduct was permissible would not have been reasonable.  In other words, a reasonable officer would know that unnecessarily beating a prisoner with a baton violates the Eighth Amendment.  Therefore, defendant Dragash is not entitled to qualified immunity.

/ / /

/ / /

/ / /

**B.**   **Medical Treatment**

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns.  See McGuckin, 974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989).  The complete denial of medical attention may constitute deliberate indifference.  See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

1    90 F.3d 330, 332 (9th Cir. 1996).

2           Plaintiff's medical treatment claim is directed against defendant Busi, who argues:

3                  Far from being deliberately indifferent to Plaintiff medical needs,
     Dr. Busi provided Plaintiff with appropriate medical treatment for a
4    variety of medical problems. For example, Plaintiff complained of head
     pain, and Dr. Busi found no visible injuries, but prescribed Plaintiff a five
5    day course of Aspirin for his complaints of pain.   Plaintiff complained of
     foot pain, and Dr. Busi referred Plaintiff to a podiatrist.   Dr. Busi also
6    ordered blood be drawn to check the levels of chemicals in Plaintiff's liver
     in order to monitor Plaintiff's chronic Hepatitis C condition.
7                  Plaintiff's allegations that Dr. Busi was deliberately indifferent to
     his medical needs amount to nothing more than his disagreement with Dr.
8    Busi's professional opinion of the proper course of treatment. Plaintiff
     believed he suffered an injury in the altercation with Officer Haynes. Just
9    as Plaintiff became upset when the psychiatrist who saw him immediately
     after the incident suggested that Plaintiff required psychiatric, not medical
10   care, Plaintiff disagreed with Dr. Busi's medical opinion that Plaintiff had
     no injuries. Dr. Busi could not have possibly rendered any medical
11   treatment to unobservable phantom injuries concocted by Plaintiff's
     altered state of mind. Dr. Busi examined Plaintiff and exercised his
12   medical judgment to provide Plaintiff with the treatment that was the most
     appropriate.   Plaintiff cannot sustain an Eighth Amendment claim against
13   Dr. Busi merely because he disagrees with Dr. Busi's medical judgment.

14   The court agrees with defendants that defendant Busi is entitled to judgment as a matter of law.

15   At his deposition, plaintiff specified that his claim against defendant Busi was based on his

16   dissatisfaction with the medical care provided to him.  Specifically, plaintiff testified that he told

17   defendant Busi about his medical complaints following the cell removal incident and that

18   defendant Busi responded by ordering a liver panel and x-rays.  There is no evidence that

19   plaintiff ever told defendant Busi about mental problems or that defendant Busi declined any

20   requested medical treatment.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

**IV.  CONCLUSION**

Based on the foregoing, the undersigned recommends that:

1.      Defendants Haynes and Wauwsrovsky be dismissed for lack of service pursuant to Federal Rule of Civil Procedure 4(m);

2.      Defendants' motion for summary judgment (Doc. 119) be granted, in part, and denied, in part;

3.      That judgment be entered as a matter of law in favor of defendants Frates, Moss, and Busi; and

4.      That this action proceed to trial as to defendant Dragash on plaintiff's excessive force claim.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED:  July 1, 2008


_Craig M. Kellison_
_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE